IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ALFREDO PEREZ-SAAVEDRA,

Defendant.

No. CR10-1005

REPORT AND RECOMMENDATION

TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     A.   Entry into the House. . . . . . . . . . . . . . . . . . . . . . . . . . 6
     B.   Initial Questioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     C.   Search for Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . 14
     D.   Search for Documents. . . . . . . . . . . . . . . . . . . . . . . . 16

V.   SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.  RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I. INTRODUCTION

On the 29th day of April, 2010, this matter came on for hearing on the Motion to Suppress Statements and Evidence (docket number 9) filed by the Defendant on April 20, 2010, as amended (docket number 17) on April 28, 2010. The Government was

represented by Assistant United States Attorney Richard L. Murphy. Defendant Alfredo Perez-Saavedra appeared personally and was represented by his attorney, Rockne Cole.

## II. PROCEDURAL HISTORY

On March 18, 2010, Defendant was charged by Indictment (docket number 2) with fraud or misuse of documents. In a Superceding Indictment (docket number 13) filed on April 22, 2010, a second count of unlawful possession of a firearm by a person illegally or unlawfully in the United States was added. Defendant has entered a plea of not guilty to these charges, and trial is scheduled for May 17, 2010.

On April 20, 2010, Defendant timely filed the instant motion to suppress. The matter was submitted to the undersigned Magistrate Judge for a report and recommendation to the district court.

## III. RELEVANT FACTS

On February 9, 2010, Special Agent Christopher Cantrell of the Bureau of Immigration and Customs Enforcement ("ICE") received information that Defendant Alfredo Perez-Saavedra may be in the country illegally, that he may be in possession of an assault rifle, and that he "got violent when he drank."[1] A records check of the social security number believed to be used by Defendant showed the number had been issued prior to Defendant's birth. Authorities were unable to find a valid driver's license associated with Defendant, which Cantrell testified "heightened my suspicion" that Defendant was in the country illegally. According to Cantrell, Iowa has taken a lead in trying to control undocumented aliens from obtaining valid driver's licenses.

Special Agent Cantrell decided to visit Defendant's house and ask about his immigration status and alleged possession of an assault rifle. A team was assembled for

---

[1] Special Agent Cantrell testified at the instant hearing. In addition to responding to questions, Cantrell specifically endorsed the accuracy of the "statement of relevant facts" found in the Government's resistance. *See* Resistance to Defendant's Motion to Suppress at 2-5 (docket number 16 at 2-5).

2

that purpose, consisting of ICE task force officers (including a deputy from a county other than Dubuque County), a police officer from the City of Dubuque, and a Dubuque County deputy sheriff. Cantrell denied that it was an unusually large team, particularly in view of the information that Defendant may possess an assault rifle.

At approximately 6:30 a.m. on February 18, 2010, the team approached a house on Pearl Street in Dubuque, Iowa, where Defendant was living at that time. Defendant lived at the house with his girlfriend, Nancy Winter, and their son (born November 2009). Defendant had moved in with Winter in July 2009. Also living in the house were Winter's two children from an earlier relationship.

Special Agent Cantrell and Officer Danielle Basten, of the Dubuque Police Department, approached the front door. The remaining four officers were off to the side and not visible to the occupants of the residence. According to Cantrell, the additional officers were for officer safety and to provide assistance if needed. Cantrell admitted that surprise "can be" a reason for going to a subject's house at 6:30 a.m. In this case, however, Cantrell denied that he was trying to catch Defendant asleep. Instead, Cantrell testified that he wanted to talk to Defendant before he left for work.[2]

Officer Basten knocked on the front door, with what she described as "the same consistency that I knock on everybody else's door." Defendant and Winter were asleep in a bedroom. Winter testified that she heard a "really loud knock at the door" and she then woke up Defendant. According to Winter, Defendant told her to wait while he went to the door. She remained in bed with the baby.

Defendant testified that he proceeded to the front door in his underwear and looked out a small window in the door. Officer Basten was wearing a police uniform and

---

[2] Cantrell testified that many subjects work "daytime hours" and leave early in the morning. Defendant generally worked from 8:00 a.m. to 4:00 p.m., although that fact was not known to Cantrell at the time.

3

identified herself to Defendant as a police officer. Special Agent Cantrell was wearing plain clothes. Defendant told the officers to "hold on" while he went to get dressed.

According to Winter, Defendant returned to the bedroom and told her to get up and get dressed. Defendant testified that he put on pants and a t-shirt and returned to the front door. Defendant then opened the front door and invited Special Agent Cantrell and Officer Basten to enter. When asked whether he thought he could simply close the door or ignore the officers, Defendant said he was "scared," it was cold outside, he didn't think he was doing "anything wrong," and he thought "it would be rude" not to let them in. According to Defendant, he had "no other option because I was frightened."

After the officers entered the room, Defendant sat on the couch. The testimony is conflicting whether Defendant was instructed to sit down by the officers. Special Agent Cantrell identified himself and asked Defendant whether he was in the country illegally. Defendant admitted that he was in the country illegally. Cantrell then asked about the weapon, and Defendant admitted that he was in possession of a rifle. Cantrell asked where the weapon was located, and Defendant told him it was in a closet in the bedroom.[3] After Defendant gave permission to search for the weapon, the other officers entered the house to assist in the search.

According to Defendant, he was not placed in handcuffs until after he told Special Agent Cantrell that he was in the country illegally and was in possession of a weapon. Defendant's testimony in this regard is largely consistent with Cantrell's testimony that after Defendant disclosed the location of the weapon and gave permission to search the house, Defendant was placed in handcuffs.[4] By that time, Winter had joined the officers

---

[3] Defendant's version differs slightly. According to Defendant, when he told Cantrell he had the weapon, he also volunteered that it was in the bedroom closet.

[4] According to Defendant, after he was placed in handcuffs, Cantrell asked "exactly where is the weapon." Officers were initially unable to find it and had to ask for further directions. Officers declined Defendant's offer to show them where it was located.

4

and Defendant in the living room. For officer safety, Winter was also handcuffed prior to the search. After the search was completed, Winter's handcuffs were removed and she was allowed to retrieve the baby, who was still in the bedroom.[5]

Special Agent Cantrell found the assault weapon, magazine, and ammunition in the closet of Defendant's bedroom. According to Cantrell, he then returned to the living room and advised Defendant of his *Miranda* rights. Defendant testified that he was given a *Miranda* warning after he admitted that he was in the country illegally and had a weapon. While the testimony was somewhat imprecise, Defendant apparently claims that he was given the *Miranda* warning immediately prior to the search, rather than immediately following the search. In any event, Defendant told Cantrell that he did not wish to answer any questions.

While searching for firearms, an ICE task force officer found a large shoe box containing documents, including documents pertaining to employment. Special Agent Cantrell asked Winter, who was sitting next to Defendant on the couch, whether Defendant had identity documents used for work and, if so, if she knew their location. According to Cantrell, Defendant "spontaneously interjected that his documents were located in a shoe box in the basement." Defendant testified that Winter did not seem to be "picking up on it" because she was nervous. According to Defendant, however, the "questions were directed more to me than to her."

---

[5] Winter testified that after they both got dressed, she and Defendant went back to the living room together. According to Winter, the door was open and the officers were in the house. Winter testified that the officers immediately placed her and Defendant in handcuffs. This testimony is not only inconsistent with the testimony of Special Agent Cantrell and Officer Basten, however, it is also inconsistent with Defendant's testimony. Defendant testified that he let the officers in and was not placed in handcuffs until four or five minutes later. Winter testified that it was "the scariest day of my life" and the Court finds that her description of the sequence of events is unreliable. Winter's testimony at the hearing was inconsistent and lacked detail. She was emotional and confused. The Court does not find her to be a credible witness.

Special Agent Cantrell then asked for permission to search the residence for documents. According to Cantrell, both Defendant and Winter consented to the search. Defendant testified that he "didn't have a choice" because "I didn't want them to do any harm to my family." Winter testified that "I did not consent to it willingly." Officers found two counterfeit social security cards and a counterfeit resident alien card bearing Defendant's photograph and the name Alfredo Perez. According to Cantrell, Defendant was then arrested and taken to jail.

## IV. DISCUSSION

### A. *Entry into the House*

Defendant first argues that his Fourth Amendment rights were violated when law enforcement authorities entered his house without a valid warrant. The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585 (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

There are exceptions, however, to the warrant requirement. Warrantless entry into a residence does not violate the Fourth Amendment if voluntary consent has been given by a resident. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1003 (8th Cir. 2010) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). *See also United States v. Almeida-Perez*, 549 F.3d 1162, 1169 (8th Cir. 2008) ("The police may enter and search a defendant's house with the voluntarily given consent of the defendant.").

Preliminarily, it should be noted that a "knock and talk" by law enforcement authorities at a private residence does not implicate the Fourth Amendment. "A 'knock and talk' is a law enforcement investigatory technique in which officers approach the door

6

of a dwelling seeking voluntary conversation and consent to search." *United States v. Wise*, 588 F.3d 531, 534 (8th Cir. 2009). It does not violate the Fourth Amendment to merely knock on a door without probable cause. *United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008). A knock and talk can become coercive, however, "if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up." *Id.*

Accordingly, Special Agent Cantrell and Officer Basten did not violate Defendant's Fourth Amendment rights by simply knocking on his door and asking if they could speak with him. Furthermore, the officers did not need a warrant to enter Defendant's home, if Defendant consented to their entry. *Cisneros-Gutierrez*, 598 F.3d at 1003. Here, both officers testified that Defendant invited them in, and Defendant admitted as much in his testimony. Defendant argues, however, that his consent was not given voluntarily. The Government concedes that it has the burden of proving the consent exception to the warrant requirement. *See Almeida-Perez*, 549 F.3d at 1169.

Defendant concedes in his brief that he "allowed [the officers] to come in." Defendant argues, however, that "the fact that he did not slam the door in their faces does not mean such consent was voluntary."[6] The law regarding consent in these circumstances was recently summarized by the Eighth Circuit Court of Appeals:

> Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," rather than the "product of duress or coercion, express or implied." Whether consent was voluntarily given "is a question of fact to be determined from the totality of the circumstances." In determining voluntariness, the personal characteristics of the individual who supposedly consented and the environment in which the consent allegedly occurred are relevant.

*Cisneros-Gutierrez*, 598 F.3d at 1003 (quoting *Schneckloth*, 412 U.S. at 225, 227).

---

[6] Defendant's Brief in Support of Motion to Suppress at 11 (docket number 9-1 at 11).

7

Here, a uniformed Dubuque police officer and an ICE agent in plain clothes approached Defendant's home early in the morning.[7] When Officer Basten knocked on the door, it woke up Defendant's girlfriend, Nancy Winter, but apparently did not awaken Defendant.[8] It was necessary for Winter to awaken Defendant.

When Defendant looked out the window of the front door, Officer Basten identified herself as a police officer and asked to speak with Defendant. Defendant told the officers to wait while he got dressed. Defendant returned to the bedroom, got dressed, and then went back to the front door and allowed the officers in. Defendant concedes that the officers did not raise their voices or threaten him in any way.

In support of his argument, Defendant cites *United States v. Conner*, 948 F. Supp. 821 (N.D. Iowa 1996). There, the Court concluded that the defendant's "decision to open the motel room door cannot be construed to be a voluntary one." *Id.* at 837. The facts in *Conner* are easily distinguished, however, from the facts in the instant action. In *Conner*, officers went to a motel room after receiving information that burglary suspects could be found there. Officers planned to knock on the front door of the room and attempt to speak to the individuals inside about the burglary. A uniformed officer knocked on the door and identified himself as a police officer, but received no response. The officer then knocked a second time and announced again that they were police officers. At that time, officers observed someone looking out of the picture window of the room. The uniformed officer then knocked a third time and announced the presence of officers. A second officer "shouted, 'Open up,' in a voice loud enough to be heard two rooms away." *Id.* at 826. Nearby residents of the motel described the officers' knocking as "a heavy knock," and one of the detectives referred to the officers' actions as "pounding." *Id.* at 827, n.5. When the defendant opened the door, an officer drew his weapon on the defendant and

---

[7] While Defendant was in bed when the officers arrived, his girlfriend testified that Defendant gets up "just about" that time in order to go to work.

[8] According to Winter, their baby generally wakes up about that time for a bottle.

8

"ordered him to back away from the door." *Id.* at 827. Defendant was then ordered to the floor, where he was placed in handcuffs.

In the instant action, Officer Basten did not pound incessantly on the door, nor did the officers refuse to leave after receiving no response. Instead, Basten knocked loudly enough to awaken Winter (who generally got up at that time to feed the baby), but not loud enough to awaken Defendant (who also generally arose at that time of the morning). There is no evidence that the officers knocked more than once or that they refused to leave. Instead, the evidence established that Defendant responded to the knock and asked the officers to wait while he got dressed. The officers did not shout "open up," or otherwise demand entry, but instead asked to speak with Defendant. Defendant testified that the officers did not raise their voices or otherwise threaten him. In short, Defendant's consent to the officers entering the house was given voluntarily.[9]

### B. *Initial Questioning*

While his motion and supporting brief are not models of clarity, Defendant appears to argue next that the officers' failure to immediately advise him of his *Miranda* rights violated the Fifth Amendment. The evidence is undisputed that after being allowed to enter Defendant's home, Special Agent Cantrell identified himself and asked whether Defendant was in the country illegally. Defendant admitted that he was not lawfully in the United States. In response to questioning by Cantrell, Defendant also admitted that he was in possession of a firearm. Defendant argues that these statements are the product of a custodial interrogation, without Defendant being advised of his right to remain silent and

---

[9] Defendant also cites two Eleventh Circuit cases, which are similarly distinguishable. In *United States v. Edmondson*, 791 F.2d 1512 (11th Cir. 1986), FBI agents with guns drawn surrounded the defendant's apartment, knocked on the door, and saw the defendant look out the window. At that point, "an agent yelled, 'FBI. Open the door.'" *Id.* at 1514. In *United States v. Newbern*, 731 F.2d 744 (11th Cir. 1984), the defendant granted entry to a motel room after pulling back the curtains in his room and seeing "the officers' badges and drawn weapons." *Id.* at 748.

9

of his right to counsel, and are therefore inadmissible pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The Government argues that Defendant was not "in custody" during the initial questioning.

"Law enforcement officials must administer *Miranda* warnings before interrogating individuals in their custody." *United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009). However, "the task of defining 'custody' is a slippery one." *United States v. Mottl*, 946 F.2d 1366, 1369 (8th Cir. 1991) (quoting *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)). The "ultimate inquiry" in determining whether a suspect is in custody is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). There are two "discreet inquiries" essential to that determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The first inquiry is factual, while the second inquiry "calls for application of the controlling legal standard to the historical facts." *United States v. Axsom*, 289 F.3d 496, 499 (8th Cir. 2002) (quoting *Thompson* at 112).

In *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), the Court identified six "indicia of custody" to consider in determining whether a custodial interrogation occurred:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning." *Axsom*, 289 F.3d at 500-01. "Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." *Id.* at 501.

A determination of whether a person is in custody for these purposes "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Martin*, 369 F.3d 1046, 1056 (8th Cir. 2004) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)). Accordingly, the Court must determine, based on "a totality of circumstances," whether Defendant was "in custody" when he was first questioned by Special Agent Cantrell.

The Court will first consider the six factors identified in *Griffin*. First, when Special Agent Cantrell entered the house, Defendant was not told that the questioning was voluntary, he could request that the officers leave, and he was not considered under arrest. Second, Defendant was not handcuffed or restrained in any way, and he retained his freedom of movement. Third, Defendant did not initiate contact with the authorities, but he voluntarily acquiesced to Special Agent Cantrell's request to respond to questions. Fourth, there is no evidence that the officers employed "strong arm tactics or deceptive stratagems." Immediately upon entering the house, Cantrell identified himself and his purpose for being there. In questioning Defendant, Cantrell did not raise his voice or make any threats. Fifth, there was only one other officer present during the questioning and it cannot be said that "the atmosphere of the questioning was police dominated." Sixth, while Defendant was not formally arrested until after the gun was located, he was placed in handcuffs immediately after consenting to a search for the weapon. Accordingly, one of the "mitigating factors" and one of the "aggravating factors" suggest that Defendant was in custody, while the remaining four factors suggest that he was not. The Court

concludes that the *Griffin* factors weigh predominately in favor of a finding that Defendant was not in custody.

However, the *Griffin* factors are non-exhaustive and are not to be mechanically applied. *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004). In *Czichray*, FBI agents called the defendant at 4:30 a.m. to ensure that he was home, stating that they had the wrong number. At 6:30 a.m., the agents approached the door. When the defendant did not answer, an agent called the defendant by telephone and told him that he needed to come to the front door. When the defendant appeared, the agents identified themselves and told the defendant that "they would like to speak with him for a few minutes." *Id.* at 825. The defendant was told, however, that he need not speak with the agents. The defendant admitted the agents into his home and they proceeded to the living room to discuss the investigation. Over the course of the next seven hours, the defendant was informed several times that his participation was voluntary, and that he was free to ask the agents to leave his home. Following the agents' instructions, the defendant called in sick to work and did not answer his phone. When he moved about his home on two occasions to go to the bathroom and his bedroom, the defendant was accompanied by an agent. The agents told the defendant that if he did not cooperate, they would "light up his world." *Id.* The defendant did not resist the agents' questioning during the interview, and he never asked them to leave. At the conclusion of the meeting, defendant signed a written statement containing admissions of illegal activity.

The district court found that the defendant was in custody during the interrogation, and that the failure to give a *Miranda* warning rendered the defendant's statements inadmissible. The Eighth Circuit Court of Appeals reversed, however, concluding that Czichray was not in custody when the inculpatory statements were made, giving particular weight to the agents' repeated warnings that his participation in the interview was voluntary, and that he was free to ask the agents to leave his home. *Id.* at 826. The Court observed that "[t]he weighty inference that Czichray was not in custody after receiving

such advice is strengthened further by the context in which the interview occurred – the living room of Czichray's home." *Id.*

> When a person is questioned "on his own turf," we have observed repeatedly that the surroundings are "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." Even our court's one brief suggestion to the contrary, also cited *Miranda* itself for the "accepted logic" that "an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody."

*Id.* at 826-27 (all citations omitted). While recognizing the often-cited factors in *Griffin*, the Court in *Czichray* cautioned that "'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* at 827. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828.

The Eighth Circuit's holding in *United States v. Axsom*, 289 F.3d 496 (8th Cir. 2002), is also instructive. There, nine federal agents entered the defendant's home at 6:45 a.m. to execute a search warrant. The defendant was "directed to sit down" while the warrant was being executed. Over the course of the next hour, two of the federal agents interviewed the defendant. When the defendant stood up to get a drink, he was instructed to "hold on just a minute" and another agent was then directed to bring the defendant a glass of water. When defendant expressed his need to use the bathroom, an agent "escorted him for security reasons." The district court concluded that the defendant was in custody and, because no *Miranda* warning was given, his statements were inadmissible. The Eighth Circuit Court of Appeals reversed. Among other things, the Court found that "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." *Id.* at 502. *See also United States v. Hernandez-Hernandez*, 327 F.3d 703 (8th Cir. 2003) (finding that because the defendant was not under arrest when he made statements to an INS agent, there was no custodial

13

interrogation requiring *Miranda* warnings). *Compare United States v. Aragon-Ruiz*, 551 F. Supp. 2d 904, 912 (D. Minn. 2008) (the defendant was in custody when he was told that "he had to answer some questions" and "was in a confined space surrounded by four armed law enforcement officials").

After considering the totality of the circumstances, the Court concludes that Defendant was not in custody when he was initially questioned by Special Agent Cantrell. The Defendant was questioned in his own home, he was not in handcuffs when questioned initially, and his freedom of movement was not restrained. Cantrell immediately identified himself and the purpose of the visit. Cantrell did not raise his voice or make any threats, and the initial questioning lasted only for a few minutes. Because Defendant was not in custody during the initial questioning, it was not necessary for officers to give Defendant a *Miranda* warning, and Defendant's motion to suppress fails on that ground.

### C. Search for Firearms

Next, Defendant argues that the authorities' warrantless search for firearms violated his Fourth Amendment rights. The Government argues that the search was conducted with Defendant's consent. "A warrantless search of a residence does not violate the Fourth Amendment if voluntary consent has been given by a resident." *Cisneros-Gutierrez*, 598 F.3d at 1003. Defendant appears to concede that he consented to the search, but argues that his consent was not given voluntarily.

The Government bears the burden of proving by a preponderance of the evidence that the consent was given voluntarily and that the officers reasonably believed that the search was consensual. *United States v. Esquivel*, 507 F.3d 1154, 1159 (8th Cir. 2007). "A consent is voluntary if the consenting individual had 'a reasonable appreciation of the nature and significance of his actions.'" *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (quoting *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986)). Stated otherwise, Defendant's consent was voluntary "if it was the product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or

implied." *United States v. Morreno*, 373 F.3d 905, 910 (8th Cir. 2004). The Court must view the totality of the circumstances and determine whether the "pressures exerted upon the suspect have overborne his will." *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989). Factors to be considered include the "characteristics of persons giving consent" and "the environment in which consent is given." *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

The Court in *Chaidez* listed some of the personal characteristics which are relevant in determining the voluntariness of a person's consent: "(1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." *Id.* (internal citations omitted). The Court will consider these characteristics as applied to Defendant.

First, Defendant is an adult, although his precise age is unknown to the Court. Second, Defendant appears to be of at least average intelligence, although the extent of his formal education is unknown to the Court. Third, Defendant was not intoxicated or under the influence of drugs when he consented to the search. Fourth, Defendant was not informed of his *Miranda* rights or of his right to withhold consent prior to consenting to the search. Fifth, while Defendant possibly received traffic tickets earlier, his awareness of the "protections afforded to suspected criminals by the legal system" is unknown. Defendant testified, however, that he was "scared" and "frightened" during the encounter.

In addition to considering the personal characteristics of Defendant, the Court must examine the environment in which his consent was given. The Court in *Chaidez* suggested that courts should ask whether the person who consented: "(1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in

custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred." *Chaidez*, 906 F.2d at 381. (internal citations omitted). The Court will examine those factors as applied to this case.

First, Defendant was questioned for only a short period of time prior to giving consent to search for the weapon. By all accounts, it was only a couple of minutes. Second, Defendant was not threatened or physically intimidated by the officers prior to consenting to the search. Third, Defendant did not rely upon any promises or misrepresentations by the police. Fourth, Defendant was not in custody or under arrest when the consent was given. Immediately after consenting to a search, however, Defendant was placed in handcuffs. Defendant was arrested after the weapon was located. Fifth, Defendant's consent was not given in "a secluded place," although it was not made in "a public place." Sixth, Defendant did not object to the search. In fact, Defendant testified that he volunteered the location of the weapon before Special Agent Cantrell even requested permission to search. When the officers were unable to find the firearm initially, Defendant gave them further directions and even offered to locate it for them.

After considering all of the facts and circumstances, the Court concludes that the Government has met its burden of proving by a preponderance of the evidence that Defendant's consent to search for the firearm was given voluntarily. The officers reasonably believed that the search was consensual. Accordingly, Defendant is not entitled to relief on this ground.

### D. Search for Documents

Finally, Defendant apparently argues that the subsequent search for documents was violative of the Fourth Amendment. The Government argues once again that the search was conducted pursuant to the voluntary consent of Defendant and his girlfriend, Nancy Winter.

After the firearm was located, Defendant was arrested based on his admissions that he is unlawfully in the United States and was in possession of a firearm. At that point, Defendant was given a *Miranda* warning and invoked his right to remain silent. While searching for firearms, one of the task force officers found a large shoe box containing documents, including what appeared to be pay stubs. Because Defendant had invoked his right to remain silent, Special Agent Cantrell asked Winter – who was sitting next to Defendant on the couch – whether Defendant had identity documents used for work and, if so, if she knew their location. According to Cantrell, Defendant "spontaneously interjected that his documents were located in a shoe box in the basement." Cantrell testified that both Defendant and Winter then consented to a search of the residence for the documents. Defendant apparently concedes that he consented to the search, but testified that he "didn't have a choice" because "I didn't want them to do any harm to my family." Similarly, Winter asserts that she "did not consent to it willingly."

As set forth above, consent is a valid exception to the Fourth Amendment warrant requirement. *Cisneros-Gutierrez*, 598 F.3d at 1003. The Government must prove by a preponderance of the evidence that the consent was given voluntarily. *Esquivel*, 507 F.3d at 1159. The analysis in this regard is largely the same as that set forth regarding Defendant's consent to search for the firearm. When Defendant gave consent to search for the documents, however, he was under arrest, in handcuffs, and had invoked his right to remain silent.

First, the Court notes that the officers did not need Defendant's consent to search, because Winter independently authorized the officers to search for the documents. *See United States v. Matlock*, 415 U.S. 164, 169 (1974) ("the voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant").[10] Winter admitted that the officers did not raise their voices, and while she

---

[10] It should be noted that this is *not* a case where a co-occupant consents to the
(continued...)

testified that she "felt threatened," there is no evidence that the officers actually threatened her. Winter was not handcuffed or otherwise detained when she consented to the search. The Court concludes that the Government has met its burden of proving by a preponderance of the evidence that Winter's consent to search for the documents was given voluntarily.

The Court also notes parenthetically that Defendant's consent to search did not constitute a violation of his Fifth Amendment rights. Special Agent Cantrell testified that his request to search for documents was directed to Winter, with Defendant then responding "spontaneously." This testimony is consistent with Defendant's testimony that Winter did not seem to be "picking up on" Cantrell's questions, thereby suggesting that Defendant volunteered an answer. "Voluntary statements not in response to an interrogation are admissible with or without *Miranda* warnings." *United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009). Moreover, a voluntary consent to search does not fall within the protections afforded by the Fifth Amendment. *United States v. Knight*, 58 F.3d 393, 397 (8th Cir. 1995) ("[T]he Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel, but there is no similar prohibition on securing a voluntary consent to search for physical evidence.").

## V. SUMMARY

The Court concludes that law enforcement's decision to visit Defendant's residence and ask about information pertaining to his legal status or unlawful possession of a firearm, did not violate the Fourth Amendment. The officers were authorized to enter the house when Defendant allowed them to do so. Defendant was not in custody when initially

---

[10](...continued)
search, while a second occupant physically present at the scene refuses permission to search. *See, e.g., Georgia v. Randolph*, 547 U.S. 103 (2006). Here, defendant not only failed to object, he affirmatively consented to the search.

questioned by the officers and, therefore, no *Miranda* warning was required. After Defendant admitted that he was in the country unlawfully and was in possession of a firearm, he voluntarily consented to a search for the weapon. After the weapon was located, Defendant was placed under arrest and given a *Miranda* warning. Nancy Winter, who was also an occupant of the house, then consented to a search for documents. While Defendant's consent was not required, he also consented to a search for documents. In summary, the Court finds no violation of Defendant's Fourth or Fifth Amendment rights.

## VI. RECOMMENDATION

It is therefore respectfully recommended that the district court **DENY** the Motion to Suppress Statements and Evidence (docket number 9) filed by the Defendant on April 20, 2010, as amended (docket number 17) on April 28, 2010.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on April 29, 2010.*

DATED this 7th day of May, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA